**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATHANIEL WRIGHT,**

                                     **Plaintiff,**

        **vs.**                                          **9:13-CV-564**
                                                         **(MAD/ATB)**

**NEW YORK STATE DEPARTMENT OF**
**CORRECTIONS AND COMMUNITY**
**SUPERVISION; ANTHONY ANNUCCI,** *Acting*
*Commissioner of DOCCS***; and SUPERINTENDENT**
**DARWIN LACLAIR,** *Franklin Correctional*
*Facility***,**

                                     **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**LEGAL SERVICES OF CENTRAL**              **SAMUEL C. YOUNG, ESQ.**
**NEW YORK – SYRACUSE**                    **JOSHUA T. COTTER, ESQ.**
472 South Salina Street
Suite 300
Syracuse, New York 13202
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                 **JUSTIN L. ENGEL, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

        Plaintiff, an inmate in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), commenced this action under Title II of the Americans with

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") seeking declaratory

and injunctive relief against Defendants. *See* Dkt. No. 1. Specifically, Plaintiff alleges that

Defendants violated the ADA and RA by denying his request to use a motorized wheelchair while

incarcerated at Marcy Correctional Facility ("Marcy C.F.") and Franklin Correctional Facility

("Franklin C.F."). Plaintiff seeks declaratory and injunctive relief ordering Defendants to permit

Plaintiff to use his motorized wheelchair, as well as "appropriate injunctions compelling

Defendants to enact policies and/or directives ensuring qualified inmates with disabilities are

allowed to use medically indicated motorized wheelchairs while in Defendants' custody." Dkt.

No. 48 at 11.[1] Currently before the Court are Plaintiff's motion for summary judgment and a

permanent injunction and Defendants' cross motion for summary judgment.

 As discussed in detail below, the Court finds that Plaintiff has failed to meet his burden

and his claims must be dismissed. As Plaintiff points out, DOCCS is somewhat of an outlier

among prison systems throughout the country regarding its policy prohibiting the use of

motorized wheelchairs. Plaintiff, however, fails to put forth evidence demonstrating that the

accommodations he has been provided in lieu of his motorized wheelchair failed to assure that he

had meaningful access to the services, benefits, and programs provided by DOCCS. Although the

Court has serious concerns about DOCCS' blanket policy prohibiting the use of motorized

wheelchairs in their facilities, this action was not brought as a class action and Plaintiff has failed

---

[1] On September 4, 2014, Plaintiff, who has been represented by counsel throughout this litigation, filed a motion to file a third amended complaint. *See* Dkt. No. 58. In the proposed third amended complaint, Plaintiff included class allegations for the first time. Plaintiff contended that the class allegations were necessary to ensure that his discrimination claims are litigated to a conclusion and because Defendants are denying Plaintiff "and all current and future similarly situated inmates, equal access to their programs, services and activities and the ability to live independently by failing to allow them use of motorized wheelchairs while in their custody." Dkt. No. 58-1 at ¶ 3. In a Decision and Order dated October 8, 2014, Magistrate Judge Baxter denied Plaintiff's motion, finding that he failed to establish good cause "by showing that, notwithstanding his 'diligence,' the deadline for amendment could not 'reasonably' have been met." Dkt. No. 62 at 7. Plaintiff did not appeal this Decision and Order.

to establish that this policy has caused him a cognizable injury. As such, Plaintiff's requests for declaratory and injunctive relief regarding this blanket prohibition must be denied.

## II. BACKGROUND

Plaintiff was diagnosed with cerebral palsy and scoliosis as a young child. *See* Dkt. No. 65-4 at ¶ 1. Due to his cerebral palsy, Plaintiff's legs are deformed. *See id.* at ¶ 2. Plaintiff has had more than fourteen surgeries to improve their functioning. *See id.* at ¶ 3. Prior to his current incarceration, Plaintiff applied and was approved for a motorized wheelchair through the New York State Medicaid program. *See id.* at ¶ 5. In order to be approved for a piece of durable medical equipment, such as a motorized wheelchair, an individual must make a showing that it is medically necessary. *See id.* at ¶ 6; *see also* N.Y. Soc. Serv. Law § 365-a(1), (2).

According to Plaintiff, he cannot be physically active for an extended period of time due to muscle stiffness and lack of motor skills associated with his cerebral palsy. *See id.* at ¶ 7. When Plaintiff first came to Marcy C.F., he was only able to walk with the aid of a cane and only for very short distances. *See id.* at ¶ 8. Plaintiff contends that he is only able to use a manual wheelchair for short periods of time because using a manual wheelchair causes him a great deal of pain. *See id.* at ¶¶ 11-12.[2]

---

[2] Although Defendants admit that Plaintiff is only able to use a manual wheelchair for short periods of time, they deny the fact that using a manual wheelchair causes Plaintiff a great deal of pain. *See* Dkt. No. 69-16 at ¶¶ 11-12. In support of this denial, however, Defendants cite to Defendant Koenigsmann's declaration in opposition to Plaintiff's motion for a preliminary injunction where he stated that "[i]t is my opinion that plaintiff's medical needs are being met." *See id.*; *see also* Dkt. No. 19-3 at ¶ 12. Further, they cite to an exhibit containing Plaintiff's grievances filed with prison officials, as well as the entire declaration of Charles Kelly, neither of which appear be relevant to whether Plaintiff experienced pain when forced to use a manual wheelchair.

Prior to his incarceration, Plaintiff was able to live an independent and self-sufficient life with his fiancée through the use of his motorized wheelchair. *See* Dkt. No. 65-4 at ¶ 13. In April 2012, Plaintiff was incarcerated at the Monroe County Jail. *See id.* at ¶ 16. During the five months he spent at the Monroe County Jail, Plaintiff used his motorized wheelchair in general population without incident. *See id.* at ¶ 17. In October of 2012, Plaintiff was transferred to DOCCS custody at Elmira C.F. *See id.* at ¶ 18. Plaintiff entered Elmira C.F. with his motorized wheelchair and was allowed to use it in the second floor infirmary at the facility. *See id.* at ¶ 19. Plaintiff did not misuse or tamper with his motorized wheelchair while at Elmira C.F. *See id.* at ¶ 20.

At Elmira C.F., Plaintiff was examined by medical staff and was found to have a permanent limitation. *See id.* at ¶ 21. Following his examination, Plaintiff was issued a medical restriction permit to use his motorized wheelchair while at Elmira C.F. *See id.* at ¶ 22. After his brief stay at Elmira C.F., Plaintiff was transferred to Marcy C.F. *See id.* at ¶ 23. The staff at Marcy C.F. replaced Plaintiff's motorized wheelchair with a manual wheelchair and placed him in general population. *See id.* at ¶ 25. Plaintiff was also informed that he would be assigned an inmate "pusher" to move him around the facility. *See id.*[3]

Both Marcy C.F. and Franklin C.F. utilize "pushers" or inmate mobility aides to move inmates with severe mobility impairments throughout the facility. *See id.* at ¶ 26. Marcy C.F. classifies inmates with mobility impairments into two categories: long distance and constant. *See id.* at ¶ 27. Inmates in the long distance category only require wheelchairs when they are moved long distances throughout the grounds of the facility. *See id.* at ¶ 28. Inmates in the constant

---

[3] Again, although Defendants deny this assertion, the citations to the record they provide in support of that denial appear to support Plaintiff's assertion.

category are constantly in wheelchairs.  *See id.*  Plaintiff claims that he is in the constant category, whereas Defendants appear to contend that Plaintiff only needs his wheelchair for long distances. *Compare id.* at ¶ 30; *with* Dkt. No. 69-16 at ¶ 30.

Shortly after arriving at Marcy C.F. and being denied use of his motorized wheelchair, Plaintiff filed a grievance requesting "reasonable accommodations needed to get around the facility independently, i.e. my power wheelchair[.]" Dkt. No. 65-4 at ¶ 31.  Superintendent Kelly denied the grievance because he found that Plaintiff's needs were being met and because "Departmental policy is to preclude the use of such items by offenders."  *Id.* at ¶ 32; *see also* Dkt. No. 15-4 at 2.  On December 24, 2012, Plaintiff appealed Superintendent Kelly's decision to the Central Office Review Committee ("CORC").  *See id.* at ¶ 33.  On May 1, 2013, the CORC denied Plaintiff's grievance.  *See id.* at ¶¶ 34-35.

On January 23, 2014, Plaintiff was transferred to Franklin C.F.  *See* Dkt. No. 65-4 at ¶ 42. Plaintiff was also denied use of his motorized wheelchair at Franklin C.F.  *See id.* at ¶ 43.  Since arriving at Franklin C.F., Plaintiff has filed two grievances.  *See* Dkt. No. 69-15 at ¶ 49.  The first, filed on February 13, 2014, complained that Plaintiff had been denied an egg crate mattress.  *See id.* at ¶ 50.  On or about April 24, 2014, Plaintiff received an egg crate mattress following a visit to sick call.  *See id.* at ¶ 51.  In Plaintiff's second grievance, filed March 27, 2014, Plaintiff complained that he had missed a doctor's appointment because he had only been told about the appointment that morning, and either there had been no mobility aide available, or no mobility aide had been willing to bring him.  *See id.* at ¶ 52.  Plaintiff's grievance requested that he be permitted to use his motorized wheelchair, and suggested that inmates be notified of such appointments in advance.  *See id.* at ¶ 53.  Plaintiff's March 27, 2014 grievance was denied by Franklin's Inmate Grievance Resolution Committee ("IGRC") after an investigation revealed that

Plaintiff had not missed the appointment because of the lack of a mobility aide to take him, but because his departure had been delayed by the facility count. *See id.* at ¶ 54.[4] The investigation revealed that mobility aides had been available on that morning. *See id.* at ¶ 55. Plaintiff was encouraged to speak with his dorm officer, or to contact his area sergeant, if he was unable to secure anyone to push him, or "if his pusher [was] not pushing him in an appropriate manner" in the future. *See id.* at ¶ 58.

Although Plaintiff lists numerous dates on which he claims that he missed or was late for programs or services, the only support for these assertions is his affidavit in support of the motion for summary judgment. *See* Dkt. No. 65-4 at ¶¶ 46-76. Further, he claims that, in many of the instances when he was late for or entirely missed a program or appointment, it was because a pusher either refused to provide him with assistance or was late in arriving to assist him. *See id.* Superintendent Patnode contends, however, that a mobility assistant who refuses to assist a mobility impaired inmate would receive a misbehavior report and could risk losing his programming as a mobility assistant altogether. *See* Dkt. No. 69-10 at ¶ 22. Superintendent Patnode contends that, upon information and belief, "a mobility assistant has never been disciplined for failing to provide assistance to Plaintiff." *Id.* at ¶ 23. Further, if an inmate follows the appropriate procedures, Superintendent Patnode asserts that correctional facility staff would become aware if a mobility assistant had refused to provide assistance to a mobility impaired inmate. *See id.* at ¶ 21.

---

[4] The Court notes that Plaintiff denies the statements set forth in paragraphs 51 through 58 "to the extent that Defendants try to characterize a written document in the record." Dkt. No. 72-1 at ¶¶ 51-58. Plaintiff does not contend that these statements are factually inaccurate or that the record does not support the assertions.

In his deposition testimony, Plaintiff stated that he did not file grievances or complaints, or otherwise inform correctional staff members about particular mobility assistants or instances in which a particular mobility aide refused to push him to a program or service. *See* Dkt. No. 69-10 at ¶ 37; Dkt. No. 65-6 at 83-100.[5]  Plaintiff further testified that he knows that when an inmate does not perform his job, that inmate would lose his job. *See* Dkt. No. 65-6 at 95-98.  According to Superintendent Patnode, "[u]nless an inmate notifies the correctional facility about a specific problem that he is having with the mobility aide program, or any program, there is no way for the facility to work with the inmate or to remedy the problem he is having."  Dkt. No. 69-10 at ¶ 38. Superintendent Patnode asserts that, had Plaintiff brought specific instances in which a mobility aide refused to provide him with assistance, actions could have been taken to ensure that it would not happen again. *See id.* at ¶ 39.

During his deposition, Plaintiff testified that inmate mobility aides were available to transport him to programs each day at Marcy C.F. *See* Dkt. No. 69-15 at ¶ 71.  At Marcy C.F., Plaintiff was assigned a mobility aide for the day, and that inmate would have Plaintiff as his "priority." *Id.* at ¶ 72.  That inmate was assigned to ensure that Plaintiff got to his programs and was returned to his dorm area following the program's completion. *See id.* at ¶ 73; *but see* Dkt. No. 72-1 at ¶ 73.  Defendants contend that, when Plaintiff's programming was completed, his dorm would be called and Plaintiff's mobility aide would be sent to pick him up. *See id.* at ¶ 74. Plaintiff testified that his mobility aide would know where he had to go and when before he left the dorm to attend his programming by checking the "call-out sheet" the night before. *See id.* at ¶ 75.  If Plaintiff saw the call-out sheet first, he would manually self-propel his wheelchair to his

---

[5] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

assigned mobility aide's cube to let him know the schedule.  *See id.* at ¶ 76; Dkt. No. 65-6 at 72-73.[6]  Programs and services generally occur in accordance with a set schedule, or "call out."  Dkt. No. 69-15 at ¶ 44.  This allows inmates to plan in advance, whether or not the need for a mobility assistant will be required.  *See id.* at ¶ 45.

Plaintiff testified that the mobility assistant program at Franklin C.F. is different from Marcy C.F. in that mobility assistants are not assigned at Franklin C.F.  *See id.* at ¶ 86.  Further, Plaintiff testified that it is his responsibility to seek out and obtain the assistance of a mobility aide.  *See id.* at ¶ 87.  Moreover, Plaintiff stated that he could ask any inmate at Franklin C.F. for mobility assistance if needed.  *See id.* at ¶ 88.  Of the eight (8) mobility assistants available in his dorm, Plaintiff has had to ask for the assistance of, at most, six (6) before he was able to obtain assistance in traveling to his programming.  *See id.* at ¶ 89.  Further, at Franklin C.F., the ratio of inmates trained as mobility assistants to inmates with mobility impairments is four-to-one.  *See id.* at ¶ 47.

During his incarceration, Plaintiff has participated in a general business vocational program and has worked as a porter.  *See* Dkt. No. 69-15 at ¶¶ 84-85.  Defendants contend that, "[w]ith the use of the manual wheelchair and mobility assistance program, Plaintiff has successfully participated in Franklin's programs and services, including an Alcohol and Substance Abuse Treatment program and a computer operator vocational program.  Plaintiff is also able to maintain his job as a porter on his housing unit."  *Id.* at ¶ 48.  Plaintiff, however, contends that his participation in these programs was not due to his use of the manual wheelchair and the mobility

---

[6] Although Plaintiff denies this assertion, he provides not citation to any evidence in the record.  *See* Dkt. No 72-1 at ¶ 76.  During his deposition testimony, however, Plaintiff testified that he would propel himself to his mobility aide if he saw the schedule before his mobility aide. *See* Dkt. No. 65-6 at 73-74.

assistance program, "but rather despite the Defendants' failure to reasonably accommodate him." Dkt. No. 72-1 at ¶ 48.

During his deposition, Plaintiff testified that when he had to use the restroom during the evening, he would not bother his mobility aide and simply propel himself. *See* Dkt. No. 65-6 at 73-74. Plaintiff does not contend that there were no mobility aides available to assist him, but that he simply did not want to bother them. *See id.*

Plaintiff contends that every day he "spends without his motorized wheelchair is a day of painful muscles from using the manual chair; of an inability to access programs, services, and activities independently; and of constant humiliation from having to ask for help for even the simplest daily activities, such as going to the restroom." Dkt. No. 67-1 at 3. Defendants point out that, although Plaintiff claims that he experiences "daily [pain] from having to struggle self-propelling [his] manual wheelchair," Plaintiff provides no medical documentation to support his claim. *See* Dkt. No. 69-15 at ¶ 99; Dkt. No. 72-1 at ¶ 99. During his deposition, when asked if he could perform the same or similar functions with use of a manual wheelchair and inmate mobility aide as those which he could perform with a motorized wheelchair, Plaintiff stated as follows: "I don't know how to answer th[at] because I don't want to say yes because it's not what I want." Dkt. No. 65-6 at 106.

In his complaint, Plaintiff alleges that Defendants violated the ADA and RA by denying his request to use his motorized wheelchair while incarcerated at Marcy C.F. and Franklin C.F. *See* Dkt. No. 48. Plaintiff requests that the Court order DOCCS to allow him to use his personal medically fitted motorized wheelchair for the remainder of his incarceration. *See id.* Further, Plaintiff requests "a declaration that DOCCS' blanket policy prohibiting the use of motorized wheelchairs by inmates regardless of the severity of their disabilities violates the ADA and

Section 504 of the Rehabilitation Act."  Dkt. No. 67-1 at 3.  Currently before the Court are the parties' cross motions for summary judgment and Plaintiff's motion for permanent injunctive relief.

## III. DISCUSSION

### A.    Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in

the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.    ADA and Rehabilitation Act claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "The ADA 'applies to inmates in state prisons.'" *Keitt v. Annetts*, No. 10-cv-157, 2012 WL 7151333, *6 (N.D.N.Y. Dec. 3, 2012) (quoting *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001)) (other citations omitted).  "'Similarly, the Rehabilitation Act, which has [also] been . . . held to apply to state prisoners . . . protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability.'" *Keitt v. N.Y.S. Dept. of Corr. and Comm. Supervision*, No. 11-cv-855, 2015 WL 2383687, *20 (W.D.N.Y. May 19, 2015) (quotation and other citations omitted).

"In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.  Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted).  Although "there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State

and local government services are generally the same as those required under section 504 of federally assisted programs and activities." *Id.* (citation omitted); *see also Graham v. Watertown City School District*, No. 7:10-cv-756, 2011 WL 1344149, *9 (N.D.N.Y. Apr. 8, 2011) ("The ADA and Rehabilitation Act causes of action for failure to accommodate will be considered together"). "A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quotation omitted).

A "qualified individual" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* (quoting 42 U.S.C. § 12131(2)).

### 1. Plaintiff's discrimination claim

First, to the extent that Plaintiff is arguing that Defendants have violated the ADA simply "by denying him use of his motorized wheelchair," Dkt. No. 65-3 at 13, the Court finds that the claim must fail. Plaintiff concedes that this denial was in accordance with Defendants' "unwritten system-wide practice precluding any inmate . . . from using a motorized wheelchair." *Id.* at 17. It is well settled that Defendants cannot be said to have violated the ADA simply by "denying [Plaintiff] a benefit that [was] provided to no one." *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (citation omitted). "The ADA requires only that a particular service provided to some not be denied to disabled people." *Id.* (citing *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir.

1998)).  Since Defendants' policy prohibits inmates from having motorized wheelchairs, denying

Plaintiff use of his motorized wheelchair cannot be said to violate the ADA or Rehabilitation Act.

*See Wasser v. New York State Office of Voc. & Educ. Servs. for Individuals with Disabilities*, No.

01-cv-6788, 2003 WL 22284576, *11 (E.D.N.Y. Sept. 30, 2003) (citing *Doe*, 148 F.3d at 82).

Further, Plaintiff cannot be said to meet "the essential eligibility requirements for the receipt of"

this service or benefit because, as discussed, Defendants do not have any such requirements.  *See*

*Rodriguez*, 197 F.3d at 619 (citation omitted).


### 2. Plaintiff's reasonable accommodation claim

Plaintiff also argues that Defendants were required to allow him to use his motorized

wheelchair as a reasonable accommodation.  *See* Dkt. No. 67-1 at 18.  Defendants, however,

contend that "Plaintiff's ADA and Section 504 causes of action must also be dismissed because

Plaintiff was provided with reasonable accommodations that afforded him meaningful access to

Defendants' services, programs, and activities."  Dkt. No. 69-14 at 8-9.  Defendants argue that

Plaintiff has conceded that they provided him with reasonable accommodations for his mobility

impairments that included, among other things, a manual wheelchair and access to an inmate

mobility assistance program.  *See id.* at 9.

Under the ADA, "the relevant inquiry asks not whether the benefits available to persons

with disabilities and to others are actually equal, but whether those with disabilities are as a

practical matter able to access benefits to which they are legally entitled."  *Henrietta D.*, 331 F.3d

at 273 (*Choate*, 469 U.S. at 301, 105 S. Ct. 712).  The Supreme Court has explained that "an

otherwise qualified handicapped individual must be provided with meaningful access to the

benefit that the grantee offers. . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Choate*, 469 U.S. at 301.

Regulations promulgated by the Department of Justice to implement the ADA provide that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). Whether something constitutes a reasonable accommodation is a fact specific inquiry and, therefore, determinations on the issue are made on a case-by-case basis. *See Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996) (citation omitted). When determining whether a defendant has complied with the ADA, the courts must evaluate the issue "in its entirety," 28 C.F.R. § 35.150(a), while staying mindful that the statute seeks to prevent discrimination that results from "thoughtlessness and indifference," or that which arises from "benign neglect." *Choate*, 469 U.S. at 295. Accordingly, courts have held that "the ADA does not . . . require perfection," *United Spinal Ass'n v. Bd. of Elections*, 882 F. Supp. 2d 615, 624 (S.D.N.Y. 2012), nor does it seek to impose the burden upon a defendant of providing the plaintiff with "optimal accommodations." *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 71 (2d Cir. 2000). When determining whether a particular accommodation constitutes a "reasonable accommodation" mandated by the Acts, the Second Circuit has explained that "'[r]easonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Fulton v. Goord*, 591 F.3d 37, 44 (2d Cir. 2009) (citations omitted).

Indeed, "[t]he ultimate inquiry is not whether a plaintiff's actual request for an accommodation is allowed, but whether the accommodation offered to the plaintiff was, in fact, reasonable." *Nelson v. Ryan*, 860 F. Supp. 76, 81 (W.D.N.Y. 1994) (citation omitted).

Accordingly, "'[a]s long as [Defendants] reasonably accommodated [Plaintiff's] disability, they need not provide him with the exact accommodations he demanded.'" *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (quotation omitted).

### a. Inmate use of motorized wheelchairs in other states

In its decision affirming this Court's denial of Plaintiff's motion for a preliminary injunction, the Second Circuit "encourage[d] the District Court to consider whether DOCCS is an outlier among state prison systems in denying prisoners the use of motorized wheelchairs, and whether its justifications for doing so have merit." *Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 568 Fed. Appx. 53, 55 (2d Cir. 2014). In light of this recommendation, Plaintiff provides some research into the practices of other prison systems. According to Plaintiff, thirty-two states and the Federal Bureau of Prisons allow motorized wheelchairs as a reasonable accommodation for an individual with a mobility impairment. *See* Dkt. No. 72 at 15. As such, Plaintiff argues that "DOCCS is an outlier and that factor weighs heavily against its contention that its self proclaimed security concerns are entitled to deference." *Id.* (citing *Holt v. Hobbs*, 135 S. Ct. 853 (2015)). Defendants contend, however, that Plaintiff misconstrues the term "outlier," given that, according to Plaintiff's data, at least eighteen (18) states, or thirty-six (36%) percent of state prison systems "would agree with Defendants' decision to preclude motorized wheelchairs in the correctional facility setting." Dkt. No. 73 at 2.

In *Holt v. Hobbs*, 135 S. Ct. 853 (2015), the prisoner plaintiff brought a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), challenging the denial of a religious accommodation under the state department of correction's grooming policy to allow him to grow a half-inch beard. The RLUIPA provides that "'[n]o government shall impose a

substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Holt*, 135 S. Ct. at 860 (quotation omitted). The Supreme Court described the "least-restrictive-means standard" as "'exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Id.* at 864. Under this framework, the Court noted the fact that "the vast majority of states and the Federal Government permit inmates to grow 1/2-inch beards" was persuasive evidence that the department's policy was not the "least-restrictive means" of satisfying its safety and security concerns. *Id.* at 866 (citation omitted).

Plaintiff acknowledges that *Holt* construed a different statute, but argues that "its holding is relevant, if not binding, in the ADA context because the ADA mandates a balancing test for determining whether an accommodation is reasonable." Dkt. No. 72 at 15-16. While the Court agrees that the practices of the majority of other states may be somewhat relevant in determining whether a requested accommodation is reasonable, the Court disagrees that this finding in *Holt* is binding on this Court in this context. First, as mentioned, the "least-restrictive-means standard" requires the government to "'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion[.]'" The ADA reasonable-accommodation provision, however, does not require the "least-restrictive means," but rather requires the government provide a reasonable accommodation that affords the plaintiff meaningful access to benefits and services. In fact, the ADA does not require Defendants to

provide Plaintiff with the accommodation of his choosing or every accommodation requested, "so long as the accommodation provided is reasonable." *Fink v. N.Y. City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995); *see also Henrietta D.*, 331 F.3d at 282 (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

Moreover, in *Holt*, the evidence presented established that more than forty (40) of the state prison systems, the District of Columbia, and the Federal Bureau of Prisons all would permit a beard such as that requested by the plaintiff. *See Holt v. Hobbs*, No. 13-6827, 2014 WL 2329778 (Brief for the United States as Amicus Curiae Supporting Petitioner); *see also Garner v. Livingston*, No. 06-cv-218, 2011 WL 2038581, *2 (S.D. Tex. May 19, 2011). In the present matter, according to Plaintiff's data, approximately eighteen (18) states, or thirty-six (36%), would agree with Defendants' decision to preclude motorized wheelchairs in the correctional facility. Although a majority of the states would permit Plaintiff to use his motorized wheelchair, it is not nearly as significant a majority as the majority at issue in *Holt*.

Finally, as discussed below, the circumstances of the present case do not warrant the injunctive relief requested. Although a situation may arise where the application of DOCCS' blanket policy prohibiting the use of motorized wheelchairs violates the ADA and RA, Plaintiff has failed to present such a case. While the practices in other jurisdictions undoubtedly provide insight into the reasonableness of a requested accommodation, Plaintiff's underlying claims nevertheless must be dismissed.

### b. Plaintiff's specific claim

In the present matter, upon review of the undisputed facts, the Court finds that Defendants provided Plaintiff with reasonable accommodations which provided him with meaningful access

to the facilities' programs and services and were not required to provide Plaintiff with his accommodation of choice. Plaintiff does not dispute that, when he arrived at Marcy C.F. on October 26, 2012, Defendants provided him with the following accommodations for his mobility impairments: the continued use of a quad cane and manual wheelchair; the use of the inmate mobility assistance program to help him travel within the facility; use of a customized wheelchair cushion that Plaintiff claims to have removed from his motorized wheelchair; knee pads; and a wheelchair accessible living space or cube.

The Court does not doubt that Plaintiff has missed and was late to arrive at various programs and meals because of the unavailability of a mobility aide or because of a mobility aide's refusal to provide assistance. Plaintiff, however, admits that he failed to make specific complaints, verbal or written, when this occurred. *See* Dkt. No. 69-10 at ¶ 37; Dkt. No. 65-6 at 83-100. As a result of Plaintiff failing to inform prison officials that various mobility aides were refusing to perform their jobs, Defendants had no way of knowing that these issues had occurred. Plaintiff further admitted that when an inmate does not perform his job, that inmate would lose his job, thereby admitting that prison officials are responsive when inmates are unwilling to perform their assigned obligations. *See* Dkt. No. 65-6 at 95-98. Aside from these issues, the accommodations that Defendants provided to Plaintiff were reasonable and provided him with meaningful access to the facilities' programs, services, and activities.

These accommodations continued to be offered to Plaintiff after his transfer to Franklin C.F. on January 23, 2014. Additionally, Defendants attempted to accommodate Plaintiff's needs even further by placing him in the wheelchair-accessible cube that was located closest to the wheelchair accessible bathroom. At Franklin C.F., the ratio of mobility aides to inmates with mobility impairments is four-to-one. *See* Dkt. No. 69-15 at ¶ 47. Although this ratio is intended

to ensure that mobility aides are always available when needed, Plaintiff testified that he was able to ask any inmate for help if needed. *See id.* at ¶ 88. Further, of the eight (8) mobility aides available in his dorm, Plaintiff has had to ask for the assistance of, at most, six (6) before he was able to obtain assistance in traveling to where he needed to go. *See id.* at ¶ 89. Although Plaintiff testified that he frequently asked a mobility aide directly for assistance, the procedures at Franklin C.F. instruct that mobility impaired inmates must notify their Housing Unit Officer or a Corrections Officer ahead of time and advise them what degree of assistance is needed. *See* Dkt. No. 69-13 at1-2. This procedure helps to ensure that mobility aides are performing their jobs and mobility impaired inmates are receiving the accommodations they require. *See* Dkt. No. 69-10 at ¶ 21. Plaintiff's failure to use this procedure does not render the accommodation provided unreasonable.

During his deposition, Plaintiff testified that when he had to use the restroom during the evening, he would not bother his mobility aide and just propel himself. *See* Dkt. No. 65-6 at 73-74. Significantly, as mentioned above, Plaintiff does not contend that there were no mobility aides available, but he simply did not want to bother them. *See id.* Simply because Plaintiff may not have wanted to bother one of the available mobility aides when he had to use the restroom during the evening does not mean that they were unavailable if he needed their assistance.

Plaintiff's continued failure to inform DOCCS officials regarding specific incidents involving mobility aides unwillingness or unavailability also demonstrates that most, if not all, of the difficulties Plaintiff has faced because of the decision to deny him use of his motorized wheelchair, are from Plaintiff's unwillingness to take advantage of the accommodations provided. *See Thomas v. Pa. Dep't of Corr.*, 615 F. Supp. 2d 411, 425 (W.D. Pa. 2009) (dismissing the plaintiff's ADA reasonable accommodation claim and noting that the plaintiff's "inability to

meaningfully access programs, services and activities, therefore, appears to stem from his decision not to accept the accommodation offered to him and not because defendants failed to accommodate him in the first instance"). In his reply, Plaintiff takes issue with the fact that Defendants "speculate on what they could or would have done if they had knowledge of Mr. Wright's difficulties with the pusher program at both Marcy and Franklin." Dkt. No. 72 at 20. Plaintiff contends that he should not be required to grieve "every instance in which a pusher left him far from his destination, refused to bring him to a program or service, or brought him late." *Id.* at 20-21. The Court absolutely agrees that Plaintiff should not have to grieve every issue he had with the inmate mobility program. Significantly, however, not once did Plaintiff bring his specific issues to the attention of the staff at either correctional facility. Similarly, Plaintiff's general grievances requesting his motorized wheelchair do not address his issues with the inmate mobility aides and thereby failed to provide Defendants with an opportunity to address any of the alleged issues.

Beginning in late March of 2014, Plaintiff claims that he began recording "the instances where I was late or denied access to a program or service and included them in my correspondence with my attorney." Dkt. No. 65-1 at ¶ 3. In his affidavit, Plaintiff lists a total of twenty eight (28) such instances. *See id.* at ¶¶ 3-30. Plaintiff, however, fails to provide any citation to the record to corroborate these occurrences. *See id.* For example, Plaintiff claims that on May 9, 2014, he "urinated in [his] pants because [he] was unable to move the manual wheelchair to the bathroom in time, and nobody was available to push me. That same day [he] had to sit in the infirmary for over an hour and a half because no inmate came to pick [him] up and push [him] back to the dorm." *Id.* at ¶ 7. Moreover, Plaintiff claims that he had to "perform his job as a dorm porter by crawling on his hands and knees." Dkt. No. 65-4 at ¶ 40. Despite

these alleged incidents, which almost always happened in very public areas within the jail, Plaintiff failed to produce a single witness to corroborate any of these events. It is entirely implausible that incidents such as this would not be documented by the prison staff in some way. *See Deebs v. Alstom Transp., Inc.*, 346 Fed. Appx. 654, 656 (2d Cir. 2009) (holding that, if the only evidence cited is self-serving testimony and no attempt has been made to square that testimony with "the hard evidence adduced during discovery," such testimony is insufficient to defeat summary judgment) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Moreover, during his deposition, when asked if he could perform the same or similar functions with use of a manual wheelchair and inmate mobility aide as those which he could perform in a motorized wheelchair, Plaintiff stated as follows: "I don't know how to answer th[at] because I don't want to say yes because it's not what I want." Dkt. No. 65-6 at 106. When further pressed, Plaintiff admitted that he would be able to, but claimed that it would then take away from what the mobility aide would otherwise be doing. *See id.* Simply because Plaintiff would prefer to have his motorized wheelchair does not render the accommodations that Defendants have provided unreasonable. Plaintiff is entitled to a reasonable accommodation that permits him meaningful access to the services and benefits provided to non-disabled inmates; he is not entitled to the accommodation of his choice. *See Thomas*, 615 F. Supp. 2d at 425-26 (holding that the prisoner's preference for one type of prosthesis did not render a different type of prosthesis an unreasonable accommodation so long as prosthesis provided to the prisoner allowed him to access prison services); *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (explaining that, although a public entity must make "reasonable accommodations," it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice) (citation omitted).

In his reply, Plaintiff next contends that the Department of Justice's regulations require Defendants to allow Plaintiff to use his motorized wheelchair. *See* Dkt. No. 72 at 5-7. Specifically, Plaintiff argues that "28 C.F.R. § 35.137(a) requires public entities to allow individuals" to use "'wheelchairs' in pedestrian areas as well as 'manually-powered mobility aids, such as walkers, crutches, canes, braces, or other similar devices.'" *Id.* at 6. Plaintiff further contends that "subdivision (b)(1) of the same regulation mandates that public entities allow individual[s] with mobility impairments to use 'other' power driven devices, such as segways, subject to safety requirements. 28 C.F.R. § 35.137(b)(1). By imposing a safety requirement for other 'power-driven mobility devices' like Segways, the drafter makes clear that the requirement to allow motorized wheelchairs is absolute." *Id.* The Court disagrees.

Although the requirement to permit wheelchairs does not include the same safety limitation included with the use of "other" power driven devices, Plaintiff ignores several important considerations. First, the Court finds that Plaintiff's interpretation of this provision strains reason. The regulation itself states that it applies "in any areas open to pedestrian use." 28 C.F.R. § 35.137(a). The interior of a prison, not generally open to the public, cannot reasonably be considered an "area[ ] open to pedestrian use." Further, in the explanation provided for the implementation of these regulations, the Department of Justice explained that "covered entities must allow people with disabilities who use wheelchairs (including manual wheelchairs, power wheelchairs, and electric scooters) and manually-powered mobility aids such as walkers, crutches, canes, braces, and other similar devices into *all areas of a facility where members of the public are allowed to go*." U.S. Dep't of Justice, *ADA Requirements: Wheelchairs, Mobility Aids, and Other Power-Driven Mobility Devices* (Jan. 2014), *available at* http://www.ada.gov/opdmd.htm (emphasis added). Clearly, the Department of Justice's

understanding of its own regulations support the Court's interpretation because, generally speaking, members of the public are not given unfettered access to prisons. This regulation also prohibits a public entity from "ask[ing] an individual using a wheelchair or other power-driven mobility device questions about the nature and extent of the individual's disability." 28 C.F.R. § 35.137(c)(1). If the Court were to adopt Plaintiff's reading of this regulation and its applicability to the prison setting, it would follow that prison officials would be prohibited from questioning an inmate's actual need for a wheelchair, which they are clearly allowed to do.

The Court's reading of the regulation is further supported by the manner in which the ADA has been applied in the prison context. Courts have repeatedly held that neither the ADA nor the RA require prisons to take actions that unduly jeopardize their safety and security. *See Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 285-86 (1st Cir. 2006) (holding that the defendant did not violate the ADA when, for security reasons, it denied an inmate the use of his cane which in turn prevented the inmate from using the outdoor recreation yard); *Randolph v. Rodgers*, 170 F.3d 850, 859 (8th Cir. 1999) (ordering the district court to consider, in determining on remand whether the ADA required a prison to provide an interpreter to a deaf inmate, evidence related to safety and security issues); *Purcell v. Pennsylvania Dep't of Corr.*, No. 00-cv-181J, 2006 WL 891449, *12 (W.D. Pa. Mar. 31, 2006) ("Prison officials may determine the reasonableness of the accommodation request in consideration of other penological needs in the prison setting, such as security, safety and administrative exigencies").

In support of his motion, Plaintiff submitted the report of Eldon Vail, the former Secretary for the Washington State Department of Corrections. Dkt. No. 65-6. Prior to serving as Secretary, Mr. Vail served as Deputy Secretary. *Id.* at 8. In both positions, Mr. Vail claims that

he "supervised and was directly responsible for all operations of the agency, including medical services and for compliance with the requirements of the [ADA]." *Id.* In Mr. Vail's opinion,

> DOCCS erred in denying Mr. Wright access to his personal, motorized wheelchair. They have failed to identify any legitimate security concerns to deny him his chair. DOCCS made no serious attempt to explore and evaluate if any legitimate security concerns existed related to the motorized chair or if alternatives to denying him his chair were available. The result is that Mr. Wright does not have the same opportunity as a non-disabled inmate to access basic services and program opportunities during his incarceration.

*Id.* at 9-10. Mr. Vail also takes issue with the report of Colonel Bradford, claiming that the security concerns listed "are simply not consistent with the operation of any modern prison or that could be easily mitigated by staff." *Id.* at 30. Colonel Bradford's report expresses concerns about the removal of pieces of metal from the chair that could be fashioned into weapons and the possibility that the chemicals in the chair's batteries could be removed and weaponized. Mr. Vail asserts that, in his experience, "the chairs are so important to the individual inmate that they do not allow the security of their chairs to be violated." *Id.* at 31. Further, Mr. Vail discounts Defendants' concerns that the motorized wheelchair would facilitate the movement of contraband within the facility, arguing that the same situation is presented by the use of a manual wheelchair. *See id.* at 32.

Plaintiff may be correct that some of Defendants' security and financial concerns are exaggerated. Regardless, the fact remains that Defendants provided Plaintiff with reasonable accommodations that permitted him meaningful access to the facilities' programs, benefits, and services. Simply because Plaintiff believes that his motorized wheelchair is preferable does not make the accommodations he was afforded unreasonable. *See McElwee*, 700 F.3d at 640; *Alster*, 745 F. Supp. 2d at 340 (holding that "'[a]s long as [Defendants] reasonably accommodated [Plaintiff's] disability, they need not provide him with the exact accommodations he demanded'")

(quotation omitted); *see also Thomas*, 615 F. Supp. 2d at 425 (dismissing the plaintiff's ADA reasonable accommodation claim and noting that the plaintiff's "inability to meaningfully access programs, services and activities, therefore, appears to stem from his decision not to accept the accommodation offered to him and not because defendants failed to accommodate him in the first instance").

Finally, Plaintiff contends that his "dependence on other inmates that DOCCS requires from Mr. Wright is the exact opposite of what Congress intended when it passed the ADA and Section 504." Dkt. No. 72 at 12. Plaintiff contends that "[m]eaningful access under the ADA and Section 504 is access that does not require the cooperation of a third party, at least where dignified, independent access can be assured by allowing a reasonable accommodation." *Id.* (citing *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 200 (2d Cir. 2014); *Paulson*, 525 F.3d at 1269; *Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013)).

The cases cited by Plaintiff do stand for the general proposition that the Rehabilitation Act's "emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008). None of the cases Plaintiff provides, however, discusses this concept in relation to prisons. For example, in *Paulson*, the plaintiffs were visually impaired individuals challenging the fact that they are denied meaningful access to U.S. paper currency. *See id.* at 1269-70. In *Disabled in Action*, the plaintiffs sought injunctive relief that would require the board of elections to remove physical barriers at polling places that prevented individuals with mobility impairments from entering to vote without the assistance of others. *See Disabled in Action*, 752 F.3d at 192-93. The Second

Circuit found that these plaintiffs should not be required to rely on "the *fortuitous assistance* of others" in order to vote.  *See id.* at 200 (emphasis added).

Unlike the cases upon which Plaintiff relies, the accommodations Defendants have already provided him do not require him to rely on "the fortuitous assistance of others" in order to have meaningful access to the facilities' benefits, services, and programs.  Rather, at Marcy C.F., Plaintiff was assigned an individual to assist him with his mobility issues and at Franklin C.F., Plaintiff was assigned to a dorm that housed eight (8) mobility aides, all of whom were trained and ordered to provide Plaintiff with assistance when required.  Moreover, in *Disabled in Action*, the Second Circuit found that the "steps required by the Acts include the very accommodations that plaintiffs propose," which included "*assigning individuals to assist those with disabilities*[.]"  *Id.* at 201 (emphasis added).  As such, the very case upon which Plaintiff relies found that assigning individuals to assist those with disabilities was a reasonable accommodation.  Similarly, in *Mason v. Correctional Medical Servs., Inc.*, 559 F.3d 880 (8th Cir. 2009), the court found that the blind prisoner was provided with meaningful access to prison benefits and that the prison was not required to provide the plaintiff with alternative accommodations, such as Braille materials or computer software that would read written materials aloud, since the plaintiff was provided with an inmate reader and had access to audio tapes of written material.  *See id.* at 889.  Therefore, the Court finds unpersuasive Plaintiff's argument that he is "denied meaningful access to DOCCS programs, benefits and services not only when he misses lunch or dinner or is unable to go to the law library but every single time he has to rely on another individual to take [him to] or access a DOCCS program, service or benefit."  Dkt. No. 72 at 12.

Although there may come a time when a plaintiff can establish that Defendants' blanket policy prohibiting the use of motorized wheelchairs within their prisons violates his or her rights

under the ADA/RA, Plaintiff has failed to meet this burden. Based on the foregoing, the Court finds that Defendants provided Plaintiff with reasonable accommodations that gave him meaningful access to the facilities' programs, benefits, and services. Accordingly, the Court denies Plaintiff's motion for summary judgment and grants Defendants' cross motion for summary judgment.

### 3. Failure to grieve

Plaintiff complains that the arrangements Defendants made were insufficient to accommodate his disability and, therefore, failed to provide him with meaningful access to programs and services because the unreliability of his assigned mobility aide or aides caused him to be late to programs and services, "miss[ ] them entirely on occasion," left him unable to attend sick call or doctor's appointments, and deprived him of reasonable access to the law library. *See* Dkt. No. 65-3 at 21-22. As Defendants correctly point out, however, Plaintiff concedes that he never filed a grievance, issued a formal complaint, or otherwise complained about the particulars of any of the occurrences he now alleges.

As the Supreme Court has explained, a plaintiff seeking injunctive relief is "appeal[ing] to the sound discretion which guides the determinations of courts of equity" and, therefore, "must show that the intervention of equity is required." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (quotation omitted). Accordingly, "[w]hen a prison inmate seeks injunctive relief, a court need not ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may properly be compelled to pursue them." *Id.*

Although Plaintiff claims that Defendants' denial of his request to use his motorized wheelchair caused him "to have difficulty accessing . . . programs and services at Marcy,"

-27-

Plaintiff never provided details regarding these incidents to staff at Marcy C.F. Further, as discussed, Plaintiff failed to address these specific concerns through the prison grievance system. While Plaintiff did file a grievance which references his request for his "power wheelchair," this grievance was filed three days after his arrival at Marcy C.F. and made no mention of any perceived deficiencies in the inmate mobility assistance program. Without providing Defendants with this information, it is clear that Plaintiff failed to provide them with an opportunity to rectify any of the alleged deficiencies.

Further, as mentioned, since arriving at Franklin C.F. in January of 2014, Plaintiff filed two grievances with the IGRC. In the February 13, 2014 grievance, Plaintiff complained that he had been denied an egg crate mattress. Shortly thereafter, this issue was resolved after Plaintiff visited sick call. In his second grievance, filed on March 27, 2014, Plaintiff complained that he had missed a doctor's appointment because he had only been told about the appointment that morning, and there had either been no mobility aide available to assist him, or no mobility aide willing to assist him. As discussed, however, the timing of the prison count caused Plaintiff to miss his doctor's appointment, not any deficiency with the inmate mobility assistance program.

During his deposition, Plaintiff admitted that when a mobility aide failed to properly perform his job or simply refused to assist Plaintiff, he did not specifically raise these issues with prison staff, either through a formal grievance or informal complaint to staff. Further, Plaintiff conceded that prison staff is responsive to such issues, testifying that when an inmate does not perform his job, that inmate would lose his job. *See* Dkt. No. 65-6 at 95-98. According to Superintendent Patnode, "[u]nless an inmate notifies the correctional facility about a specific problem that he is having with the mobility aide program, or any program, there is no way for the facility to work with the inmate or to remedy the problem he is having." Dkt. No. 69-10 at ¶ 38.

Plaintiff's failure to provide Defendants with an opportunity to rectify any issues Plaintiff may have had with the inmate mobility aides makes the injunctive relief Plaintiff seeks particularly inappropriate in the present matter. *See Farmer*, 511 U.S. at 847; *Disabled in Action*, 752 F.3d at 202 (noting that, although equitable relief is available under both the ADA and RA, the court must still consider "whether the 'exercise of equitable power [reflects] a proper respect for the integrity and function of local government institutions'") (quoting *Jenkins*, 495 U.S. at 51, 110 S. Ct. 1651).

This result is consistent with one of the underlying policies behind the ADA. In enacting these provisions, Congress contemplated a system in which "'employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'" *Kennedy v. St. Francis Hosp.*, 225 F. Supp. 2d 128, 138 (D. Conn. 2002) (quoting *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)) (other citations omitted). According to the regulation, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). From the outset, Plaintiff refused to engage in an interactive process with Defendants, and instead maintained the position that, in his opinion, the only acceptable accommodation for him was to be permitted the use of his motorized wheelchair. Plaintiff's refusal to fully take advantage of the accommodations and processes in place to ensure his needs are met make the equitable relief Plaintiff seeks in the present matter particularly inappropriate.

Accordingly, the Court denies Plaintiff's request for relief on this alternate ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment and permanent injunctive relief is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge