**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**NATHANIEL WRIGHT,**

                              **Plaintiff,**

              **v.**                                                    **9:13-CV-0564**
                                                                        **(MAD/ATB)**

**NEW YORK STATE DEPARTMENT OF**
**CORRECTIONS AND COMMUNITY**
**SUPERVISION; ANTHONY ANNUCCI,** *Acting*
*Commissioner of DOCCS;* **and SUPERINTENDENT**
**DARWIN LACLAIR,** *Franklin Correctional*
*Facility,*

                              **Defendants.**

_____

**APPEARANCES:**                          **OF COUNSEL:**

**LEGAL SERVICES OF CENTRAL**            **SAMUEL C. YOUNG, ESQ.**
**NEW YORK – SYRACUSE**                  **JOSHUA T. COTTER, ESQ.**
**472 South Salina Street**
**Suite 300**
**Syracuse, New York 13202**
**Attorneys for Plaintiff**

**OFFICE OF THE NEW YORK**              **JOSHUA E. McMAHON, ESQ.**
**STATE ATTORNEY GENERAL**              **JAMES J. SEAMAN, ESQ.**
**The Capitol**
**Albany, New York 12224**
**Attorneys for Defendants**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

On May 15, 2013, Plaintiff Nathaniel Wright ("Plaintiff" or "Wright"), an inmate in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), filed this action under Title II of the Americans with Disabilities Act ("ADA") and

Section 504 of the Rehabilitation Act ("RA") seeking declaratory and injunctive relief against

DOCCS, Commissioner Anthony Annucci ("Annucci"), and Superintendent Darwin LaClair

("LaClair") ("Defendants").  Dkt. Nos. 1, 28.

     The Court held a bench trial on February 13, 2017 through February 15, 2017.  At the

close of the trial, Defendants moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of

law as to all claims.  Plaintiff opposed the motion and cross moved pursuant to Fed. R. Civ. P. 52

for findings and conclusions by the Court or, in the alternative, for a preliminary injunction.  The

motions were denied.

     Having reviewed the parties' pre-trial submissions, the trial transcript, and post-trial

submissions, the Court makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT[1]

**A.     Jurisdiction and Plaintiff**

1.     This Court has jurisdiction over the subject matter of the instant claims pursuant to 28

     U.S.C. § 1331.  Dkt. No. 114, The basis of federal jurisdiction, ¶ 1.

2.     Plaintiff was born with cerebral palsy and scoliosis, and used a motorized wheelchair for

     approximately 15 years prior to his incarceration.  Dkt. No. 114, Relevant Facts Not in

     Dispute, ¶ 1.  Plaintiff's legs are severely deformed and he has had over fourteen

     operations on his legs to improve their functioning.  *Id.*, ¶ 2, 3.  Plaintiff also suffers from

     a torn rotator cuff.  Transcript of Trial ("Tr.") at 12.

3.     DOCCS did not have a written policy or directive banning the use of motorized

     wheelchairs; rather it was a system wide practice put into place by staff.  Dkt. No. 114,

---

[1]     Prior to trial, the parties submitted a Joint Pre-Trial Stipulation, which contained certain stipulated and undisputed facts.  *See* Dkt. No. 114.  The Court's findings of fact are derived from the parties' stipulated facts, the trial transcript, and exhibits.

Relevant Facts Not in Dispute, ¶ 82.  Thirty states and the Federal Bureau of Prisons consider allowing motorized wheelchairs as a reasonable accommodation.  *Id*., ¶ 127.

**B.    Plaintiff's Motorized Wheelchair**

4.    Plaintiff received his motorized wheelchair after he applied and was approved by the New York State Medicaid program.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 4.  With the use of his motorized wheelchair Plaintiff was able to live an independent and self-sufficient life with his fiancée in Rochester, NY.  *Id*., ¶ 5.

5.    Plaintiff's motorized wheelchair is the Invacare Torque III.  Tr. at 178; Joint Exhibit ("Jt. Exh.") 17.  The batteries in the wheelchair weigh fifty-one pounds each and are sealed and bolted beneath a metal plate.  *Id*. at 181.  Some hardware, including the armrest, seat, and headrest, are removable.  *Id*. at 187.  The motorized wheelchair weighs between 228 and 258 pounds and can achieve a maximum speed of 5.8 miles per hour.  *Id*. at 192.  The speed may be adjusted downward and the wheelchair should not be operated on an incline greater than nine percent.  Tr. at 145, 192.  The wheelchair must be charged with a cord that is approximately twelve feet in length.  *Id*. at 146.  The wheelchair also contains polyurethane foam.  *Id.* at 152.

**C .    Monroe County Jail ("Monroe C.J.") and Elmira Correctional Facility ("Elmira C.F.")**

6.    In April 2012, Plaintiff was incarcerated at the Monroe C.J.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 6.  During the five months he served at the Monroe C.J., Plaintiff used his motorized wheelchair in general population, without incident.  *Id*., ¶ 7.

7.    In October of 2012, Plaintiff re-entered DOCCS' custody when he was transferred from the Monroe C.J. to Elmira C.F.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 8.  On October 12, 2012, Plaintiff received a medical permit to use his motorized wheelchair.  Jt.

3

Exh. 22.  Plaintiff used his motorized wheelchair within the confines of the second floor

infirmary and never entered general population.  Dkt. No. 114, Relevant Facts Not in

Dispute, ¶ 10.  Plaintiff did not misuse or tamper with his motorized wheelchair while at

Elmira C.F.  *Id.,* ¶ 11.  Plaintiff was also able to ambulate with a cane and to propel

himself short distances in a manual wheelchair.  *Id*., ¶ 12.

**D.    Marcy Correctional Facility ("Marcy C.F.")**

8.    After approximately one week at Elmira C.F., Plaintiff was transferred to Marcy C.F.

Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 13.  Plaintiff was told by a sergeant that he

could not have his motorized wheelchair because it posed a security risk.  Tr. at 19.

Plaintiff was advised to "grieve" the issue.  *Id*.  Plaintiff received a manual wheelchair and

was allowed to remove the customized chair cushion from his motorized wheelchair for

use in the manual wheelchair.  *Id*. at 26; Dkt. No. 114, Relevant Facts Not in Dispute, ¶

15.  Plaintiff was provided with pads for his knees and assigned a wheelchair accessible

living space.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 16, 17.

9.    Plaintiff received assistance from the Inmate Mobility Assistance Program ("IMAP") to

help him travel within the facility.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 14.  At

Marcy C.F., the IMAP is a paid job program for inmates.  Tr. at 336.  At the relevant time,

there were twenty-five to thirty mobility assistants housed and assigned to the same

dormitory as the inmates who required assistance.  *Id.* at 337, 338.  Generally, when the

inmates were scheduled to attend programs, the mobility assistant would move the

wheelchair-bound inmate to school, counseling, or vocation.  *Id.*  Once the inmate arrived

at the program, the mobility assistant would leave and return to the dormitory where he

may pick up another mobility impaired inmate to transport to programs.  *Id*. at 338.  When

programs ended, the assistant would return to the area and push the wheelchair inmate back to the dorm.  Tr. at 337-38.  A mobility-impaired inmate may be aided by different assistants over the course of a day.  *Id*. at 338.

10.    On October 29, 2012, three days after his arrival at Marcy C.F., Plaintiff filed a grievance seeking "reasonable accommodations needed to get around the facility i.e., my motorized wheelchair."  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 22; Jt. Exh. 2.

11.    On November 27, 2012, the Superintendent of Marcy C.F. Charles F. Kelly ("Kelly") denied the grievance explaining that, "the possession/use of a motorized wheelchair in a correctional setting includes numerous safety & security issues, Departmental policy is to preclude the use of such items by offenders."  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 23; Jt. Exh. 2; Tr. at 305-307.

12.    Plaintiff appealed Kelly's determination to the Inmate Grievance Program Central Office Review Committee ("CORC").  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 26; Jt. Exh. 2.  On May 1, 2013, CORC denied Plaintiff's appeal finding that Plaintiff was issued a properly fitting manual wheelchair with a chair cushion, an egg crate mattress, and quad cane.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 27-28; Jt. Exh. 2.  CORC noted that, "[r]easonable accommodations include being assigned another inmate who is programmed as a mobility aide to assist him with daily living activities and movement within the facility."  *Id.*  CORC also addressed "legitimate security concerns regarding the strength of the battery, massive amount of wiring, etc."  *Id.*

13.    Plaintiff was advised to "address medical concerns via sick call."  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 27-28.  From December 8, 2012 through April 8, 2013, Plaintiff did not request sick call.  *Id*., ¶ 30; Jt. Exh. 7.

14.   On March 17, 2013, Plaintiff wrote a letter to the "medical staff" at Marcy C.F. advising

that, "just because I don't come to sick call does not mean that I'm not in pain." Jt. Exh. 7.

15.   In February 2013 and August 2013, Plaintiff filed grievances requesting use of his

motorized wheelchair. Jt. Exhs. 3, 4; Tr. at 21, 310. Plaintiff complained that, "using a

non-fitted manual wheelchair is painful for me, pusher or not[.]" Jt. Exh. 3. Kelly denied

the grievances. Jt. Exhs. 3, 4.

16.   Plaintiff did not formally complain or file grievances about the IMAP at Marcy C.F. Tr.

at 25, 340.

**E.    Franklin Correctional Facility ("Franklin C.F.")**

17.   On January 23, 2014, Plaintiff was transferred to Franklin C.F. Dkt. No. 114, Relevant

Facts Not in Dispute, ¶ 37. Plaintiff was denied the use of his motorized wheelchair at

Franklin C.F. *Id.*, ¶ 38. Plaintiff continued to use a manual wheelchair, with his custom

chair cushion, and was provided access to the IMAP. *Id.*, ¶ 38, 39. Plaintiff was assigned

to a wheelchair-accessible cubicle located closest to a wheelchair-accessible bathroom.

*Id.*, ¶ 40.

18.   The Franklin C.F. Facility Operations Manual 300 ("FOM 300") defines mobility

assistants as, "[a]n inmate who is specifically trained and programmed to assist a mobility

impaired inmate by pushing a wheelchair and/or aiding that inmate with daily living

skills." Jt. Exh. 21. FOM 300 further provides:

> Mobility impaired inmates have the option of requesting assistance of
> a mobility assistant to move from one place to another or to transport
> themselves. If assistance is needed, the mobility impaired inmates
> must notify their Housing Unit Officers well in advance and advise
> them as to what degree of assistance is needed.

*Id.*; Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 42, 43.

19.    During the relevant time period at Franklin C.F., the ratio of mobility assistants to wheelchair inmates was 4:1 or 5:1.  Tr. at 254-55.  Mobility assistants were paid for the job assignment.  *Id*. at 256.  The dormitory officer supervised and assigned the assistants to four hour shifts beginning at 6:00 a.m.  *Id.* at 256, 280, 282-83.  After 10:00 p.m., if an inmate needed assistance, he was required to notify the officer and the officer would direct one of the mobility assistants to help him.  *Id.*

20.    At the relevant time, the B1-Dorm at Franklin C.F. could accommodate four wheelchair inmates.  Tr. at 279.  There were fourteen to eighteen mobility assistants housed in the B1-Dorm.  *Id*. at 280.  The dormitory officer in B1-Dorm posted a schedule for the mobility assistants that was visible to all of the inmates.  *Id*. at 279, 283.  The schedule was different each day.  *Id.* at 283.  If an inmate wished to go to a non-mandatory program such as meals or yard, the inmate was required to alert the assistant.  Tr. at 283, 289.  If an inmate needed assistance to get to the bathroom, he was required to ask the dormitory officer.  *Id*. at 287, 295.

21.    In March 2014, Plaintiff began recording instances where he "was late or denied access to a program or service" because an assistant refused to help him, arrived late, or would only transport him a short distance.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 75; Jt. Exh. 8.  Plaintiff described incidents, from March 27, 2014 through November 2014, where he was late for appointments, missed meals, and soiled himself.  Jt. Exh. 8.

22.    On March 27, 2014, Plaintiff filed a grievance claiming that the IMAP "doesn't work."  Jt. Exh. 6.  Plaintiff claimed that he missed a doctor's appointment because, "no one wanted to push me."  *Id*.  Plaintiff asked for the "independence" that his motorized wheelchair provided.  *Id*.; Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 53.

23. On April 17, 2014, the Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's grievance.  Jt. Exh. 6.  The IGRC determined that Plaintiff did not miss his appointment due to the lack of a mobility aide but, rather, due to a facility count.  *Id.*; Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 54.  Plaintiff appealed the decision.  Jt. Exh. 6.  On April 29, 2014, Superintendent Darwin LaClair ("LaClair") denied Plaintiff's appeal.  *Id.*; Tr. at 225; Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 92.

24. Plaintiff did not file a grievance or complain about any specific mobility assistant at Franklin C.F.  Tr. at 26.

25. While confined at Franklin C.F., Plaintiff participated and completed Inmate Program Assistant Training, an Alcohol and Substance Abuse Treatment Program, and a computer operator vocational program.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 48; Tr. at 345-46; Jt. Exh. 28.  Plaintiff's computer class met 125 times and Plaintiff attended every class.  Tr. at 268-69.  Plaintiff was never late to class.  *Id.* at 275.

26. On August 6, 2014, Plaintiff wrote a letter to the "ADA Coordinator."  Jt. Exh. 16.  On August 20, 2014, the former ADA Coordinator, Bryan Bradt ("Bradt"), wrote to Plaintiff advising that Plaintiff's request for his motorized wheelchair did "not fall within the purview of the ADA Coordinator."  *Id.*  Bradt explained that motorized wheelchairs "are not allowed in our facilities because they pose a security and safety risk[.]"  *Id.*

**F.    Groveland Correctional Facility ("Groveland C.F.")**

27. Presently, Plaintiff is confined at Groveland C.F. in C3 Dorm, Cube 18,  which is 20 feet from the officer's station.  Tr. at 22, 380.

28. The mobility assistants are assigned to a particular inmate or a particular program and are "on call in case [an] inmate requires something impromptu without having been

8

scheduled." Tr. at 384, 398.  If an assistant is assigned to a wheelchair inmate, he is responsible for all daily and nightly required programs, call outs, legal law library, and library.  *Id.* at 399.  Assistants are required to transport an inmate to the bathroom if the inmate requests assistance.  *Id*. at 403.

29.  In the Summer of 2016, Plaintiff participated in Phase 3, a program that helps prepare the inmates for release.  Tr. at 344.  In the Fall of 2016, Plaintiff regularly attended and completed an Aggression Replacement Training at Groveland C.F.  *Id*. at 357.

30.  In December 2016, Plaintiff filed a grievance claiming that since his arrival at Groveland C.F., he has received three broken wheelchairs.  Jt. Exh. 30(d); Tr. at 51-52.  Plaintiff complained of pain from his torn rotator cuff due to "moving [him]self around the dormitory everyday . . . because [his] manual wheelchair is broken."  *Id*.  A work order was completed and the wheelchair was repaired.  Jt. Exh. 30(d).

31.  Plaintiff has not filed any grievances related to IMAP at Groveland C.F.  Tr. at 22.

32.  Plaintiff has no disciplinary history since entering DOCCS custody in 2012.  Dkt. No. 114, Relevant Facts Not in Dispute, ¶ 126.

**G.    DOCCS Directive 2614**

33.  Pursuant to DOCCS Directive 2614, Reasonable Accommodations for Inmates with Disabilities, "[i]nmate requests for accommodations shall be made in writing to the Deputy Superintendent for Program Services."  Jt. Exh. 19.  Moreover, "[a]ny inmate who disagrees with a decision on his or her request for a reasonable accommodation or who feels he/she has been discriminated against based on a disability can submit complaints pursuant to Directive #4040, 'Inmate Grievance Program.'"  *Id*.

34.  Plaintiff was compliant with Directive 2614 because he filed a grievance in October 2012

requesting a reasonable accommodation.  Tr. at 351, 444-45; Jt. Exh. 2.

**H.    DOCCS' "Individualized Assessment"**

35.    In December 2016, Gary Waldron ("Waldron"), a technical security specialist and David

Infantino ("Infantino"), the ADA Coordinator, were directed to prepare an Individualized

Assessment (the "Assessment") related to Plaintiff's request for his motorized wheelchair

and the denial of that request.  Tr. at 139, 415, 425, 427, 447; Jt. Exh. 16.

36.    Waldron was tasked with assessing the security risks regarding the motorized wheelchair.

Tr. at 139.  Waldron reviewed pictures of Plaintiff's wheelchair, the owner's manual,

Plaintiff's disciplinary history, Plaintiff's expert's reports, and conducted online research

regarding the wheelchair.  *Id.* at 140, 144 ,179.  Prior to rendering an opinion, Waldron

did not do the following: (1) personally inspect the subject wheelchair; (2) interview

Plaintiff; (3) observe Plaintiff in the manual wheelchair; (4) interview any of Plaintiff's

assistants; (5) consult with the manufacturer of the wheelchair; or (6) investigate whether

other jurisdictions allow motorized wheelchairs.  *Id.* at 160, 179, 197.

37.    Waldron concluded that the motorized wheelchair posed safety and security risks.

Specifically, Waldron had concerns with the following items: (1) size and weight of the

wheelchair; (2) foam in the seat cushion; (3) batteries; (4) "tie-downs;" (5) length of the

cord; (6) wiring; (7) small metal pieces; (8) removable parts; and (9) ease of access to

hidden areas to smuggle contraband.  Tr. at 142, 146, 147, 150, 155, 157.  Waldron also

opined that based upon the aforementioned, a proper and effective search of the motorized

wheelchair would present an undue burden upon DOCCS' staff.  *Id.* at 158.

38.    Infantino was presented with, and asked to review, a "Declaration" regarding Plaintiff's

request.  Tr. at 426.  Infantino testified that the Declaration was an "assessment" of the

"totality about [Plaintiff's] request [to] see if it could be granted." *Id*. at 425.  Waldron's

opinions regarding safety and security were incorporated into the Declaration. *Id*. at 161.

Prior to executing the Declaration, Infantino did not do the following: (1) request that

Plaintiff undergo a physical examination; (2) observe Plaintiff sitting in his manual

wheelchair; (3) review Plaintiff's disciplinary or criminal history; (4) review Plaintiff's

medical records; (5) interview Plaintiff; or (6) speak with Waldron. *Id.* at 177, 440, 443,

449.  Infantino reviewed and considered Bradt's decision.  Tr. at 427-29, 435.

39.    DOCCS concluded that the motorized wheelchair would not be approved.  Tr. at 433.

**I.    Witness Credibility**

40.    Plaintiff testified on his own behalf and called Eldin Vail ("Vail") as an expert.

Defendants called DOCCS' technical security specialist Gary Waldron ("Waldron"),

Franklin Correctional Facility ("Franklin C.F.") Superintendent Darwin LaClair

("LaClair"), Franklin C.F. Deputy Superintendent of Programs Max Patnode ("Patnode"),

Franklin C.F. Vocational Instructor, Sharon Lamb ("Lamb"), Franklin C.F. Dormitory

Officer Richard Adams ("Officer Adams"), former Marcy Correctional Facility ("Marcy

C.F.") Superintendent Charles Kelly ("Kelly"),  Marcy C.F. Deputy Superintendent of

Programs Mark Kinderman ("Kinderman"), Groveland Correctional Facility ("Groveland

C.F.") Offender Rehabilitation Coordinator Rachel Snyder ("Snyder"), Groveland C.F.

Recreation Program Leader Kevin Young ("Young"), Groveland C.F. Dormitory Officer

Patrick Bryan ("Officer Bryan"), DOCCS' Affirmative Action Coordinator David

Infantino ("Infantino"), DOCCS' Deputy Counsel Nancy Heywood ("Heywood"),

Groveland C.F. Deputy Superintendent of Programs Amy Titus ("Titus"), and Groveland

C.F. Deputy Superintendent of Administrative Services Paula Dean ("Dean").

41.    Plaintiff was a forthright and credible witness with respect to the issues surrounding his medical conditions and the use of his motorized wheelchair.

42.    Vail, Plaintiff's expert, has experience in general conditions of confinement within the correctional system, including prison security and inmate safety.  Vail was appropriately credentialed to offer an opinion in this case.  Vail reviewed DOCCS' policies, litigation materials, grievances, Plaintiff's disciplinary history, and the medical record.  Vail testified that Plaintiff's motorized wheelchair did not present any security risk beyond those already present in the prison environment.  Tr. at 89-90, 92.  Vail opined that those risks may be successfully managed in the correctional environment.  *Id*.  While the Court deemed Vail a credible witness, the credibility was tempered by the fact that Vail did not speak with Plaintiff, never personally inspected the subject wheelchair, and never visited the facilities where Plaintiff was/is incarcerated.  *Id*. at 100, 118.

43.    Waldron was credible, at times, but his lack of first-hand knowledge, as outlined in Part II(H)(36), *supra*, weighs against the overall credibility of his testimony.  As a result, Mr. Waldron's testimony was not persuasive.

44.    The testimony of Darwin LaClair, Max Patnode, Sharon Lamb, Richard Adams, Charles F. Kelly, Jr., Mark Kinderman, Kevin Young, and Patrick Bryan was straightforward and uncomplicated.  While the witnesses have an interest in their employer prevailing in this litigation, they have no personal stake in the litigation.  The Court finds their testimony to be credible.

45.    While the Court found Rachel Snyder, Nancy Heywood, Amy Titus, and Paula Dean to be credible witnesses, their testimony was not critical to the Court's disposition of the issues in this case.

46.    For the reasons set forth in Part II(H)(37), the Court did not find Infantino to be an

effective or credible witness.  Additionally, on two occasions during cross examination,

Infantino contradicted his prior deposition testimony with respect to the documentation

and medical information he allegedly reviewed prior to executing his Declaration.  Tr. at

436, 438.

## III.  CONCLUSIONS OF LAW

### A.    Relevant Standards

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility,

and rule on the facts as they are presented." *Bahrami v. Ketabchi*, No. 05 Civ. 3829, 2009 WL

513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting *Johnson-McClean Techs. v. Millennium Info. Tech.*

*Group*, No. 02 Civ. 244, 2003 WL 192175, at *8 (S.D.N.Y. Jan. 27, 2003)) (internal quotation

marks and alterations omitted); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997).

"The Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as

well as other mannerisms that bear heavily on one's belief in what the witness says.'" *Bahrami*,

2009 WL 513790, at *9 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d

623, 634 (2d Cir. 1996)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)

(noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that

bear so heavily on the listener's understanding of and belief in what is said").  If the "evidence is

equally divided . . . 'the party with the burden of proof loses." *Bahrami*, 2009 WL 513790, at *9

(quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)) (other citation omitted); *see also*

*Fulop v. Malev Hungarian Airlines*, 244 F.Supp.2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he

evidence on this issue is substantially divided and, in the Court's assessment, does not tilt

sufficiently to Plaintiff's case to satisfy the preponderance standard").  Plaintiff in this matter

bears the burden of proof.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the RA, "protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability."  *Harrington v. Vadlamudi*, No. 9:13-CV-0795 LEK/RFT, 2014 WL 4829483, *3 (N.D.N.Y. Sept. 29, 2014) (citing 29 U.S.C. § 749(a)).  The protections offered under Title II and the RA extend to inmates in state correctional facilities.  *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998).

"In order to establish a prima facie violation under these acts, [Plaintiff] must show that 1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability."  *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  Here, Plaintiff is a qualified individual and DOCCS is subject to the ADA and RA.  *See id.*  With respect to the third element, the Court must determine "whether, a plaintiff with disabilities 'as a practical matter,' was denied 'meaningful access' to services, programs, or activities to which he or she was 'legally entitled.'"  *Id.* (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).  "In order 'to assure meaningful access, reasonable accommodations in the [] program[s] or benefit[s] may have to be made.'"  *Id.* (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  "A reasonable accommodation must provide effective access to prison activities and programs."  *Id.* at 73 (citation omitted).  "An accommodation is not plainly reasonable if it is so inadequate that it

14

deters the plaintiff from attempting to access the services otherwise available to him." *Wright*, 831 F.3d at 73 (citing *Disabled in Action v. Bd of Elections in City of N. Y.*, 752 F.3d 189, 200 (2d Cir. 2014)).

"[T]he plaintiff bears the initial burdens of both production and persuasion as to the existence of an accommodation" that is "facial[ly] reasonable[]." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015). "The burden of persuasion then shifts to the defendant to rebut the reasonableness of the proposed accommodation." *Id.* "This burden of non-persuasion is in essence equivalent to the 'burden of showing, as an affirmative defense, that the proposed accommodation would cause [the Defendant] to suffer an undue hardship.'" *Id.* (citation omitted). The Second Circuit has extended this burden shifting framework to the prison setting. *See Wright*, 831 F.3d at 76.

## B.    Second Circuit Opinion

In a Memorandum-Decision and Order filed on September 30, 2015, the Court denied Plaintiff's motion for summary judgment and granted Defendants' motion for summary judgment. Dkt. No. 75. On July 29, 2016, the United States Court of Appeals for the Second Circuit issued an Order vacating the judgment and remanding the matter for further proceedings. Dkt. No. 79. The Second Circuit held that DOCCS' "blanket ban" on motorized wheelchairs, without an individualized assessment, violates the ADA and RA. *Wright*, 831 F.3d at 69. The Circuit noted that DOCCS failed to evaluate Plaintiff's "actual motorized wheelchair" or "perform an appraisal of Wright himself, i.e. there was no examination of his propensity to commit acts of violence, his disciplinary record, his past crimes, or his physical needs."[2] *Id.* at 78. The Circuit remanded the

---

[2]    The Court addressed testimony from DOCCS' Chief Medical Officer, Dr. Carl Koenigsmann, and concluded that "[a]lthough there was, in some general respects, an examination of Wright's physical needs, it was by no means individualized as required under Title II of the ADA." *Wright*, 831 F.3d at 78, n.2.

case for further review and cautioned DOCCS not to "rely upon general safety and security concerns to show that it is unduly burdened by Wright's request." *Id.* at 79. The Circuit continued, "[i]n whatever evidentiary presentation it chooses to make before the district court on remand, DOCCS must proffer specific reasons why allowing Wright the use of *his* motorized wheelchair would be unduly burdensome." *Id.* (emphasis supplied).

## C.    DOCCS' January 2017 Assessment

There is no doubt that a motorized wheelchair would be preferred over a manual wheelchair in cases where an individual cannot walk and cannot use their arms and hands to propel a manual wheelchair. But in a prison setting, an inquiry must always be made as to whether a manual wheelchair with a mobility assistant is sufficient to allow the particular inmate meaningful access to DOCCS' programs and services and whether the provision of a motorized wheelchair would unduly burden DOCCS.

In an attempt to comply with the Second Circuit Mandate, DOCCS provided the "Declaration of David Infantino." Jt. Exh. 16. The declaration purports to be an individualized assessment of Plaintiff's request for his motorized wheelchair. This Assessment gets a grade of "F" from this Court for the following reasons. First, Plaintiff was never examined, observed, or interviewed by Infantino, Waldron, or any DOCCS' employee/representative as part of the Assessment. The Assessment never considered Plaintiff's arm pain from manually operating his wheelchair. As part of the assessment, a physical examination of Plaintiff's arm strength and motor function would have been, most certainly, appropriate. Second, Infantino did not review Plaintiff's medical records or consider Plaintiff's criminal or disciplinary history. Tr. at 443. Third, Infantino was not qualified to render any opinion as he was only promoted to DOCCS' ADA coordinator in November 2016. Tr. at 433. Finally, Infantino and Waldron did not

16

personally inspect Plaintiff's motorized wheelchair before rendering their opinions. Quite stunningly, Waldron seemingly adopted the "blanket ban" when he summarily concluded that he would not recommend the approval of the use of the model of Plaintiff's wheelchair under any circumstance. Tr. at 198.

The Court finds that the Assessment" was not "individualized" in any manner. In the Mandate, the Circuit provided DOCCS with a roadmap, of sorts, detailing what the Assessment should consider and include relative to Plaintiff's request. *See Wright*, 831 F.3d at 78. Despite these instructions, DOCCS failed to assess Plaintiff's <u>specific</u> needs with respect to his <u>specific</u> motorized wheelchair. Thus, the Court gives no weight to DOCCS' Assessment and resolves the issues presented upon the testimony and admissible documentary evidence.

**D.    Meaningful Access to DOCCS' Programs and Services**

At trial, the evidence established that Plaintiff was able to attend and complete mandatory programs, such as counseling and vocational instruction, with his manual wheelchair and the IMAP. Tr. at 275, 268-69, 344-46, 357; Jt. Exh. 28. What is disputed is whether, with his manual wheelchair and the IMAP, Plaintiff has "meaningful access" to all of DOCCS' activities and services.

At each facility, Plaintiff was provided with a manual wheelchair for use with the IMAP. At trial, the Court had an opportunity to observe Plaintiff in his manual wheelchair. From a simple visual inspection, it was evident that the manual wheelchair was too large for Plaintiff, both wheels were unstable and loose, and the armrests were damaged and fastened with tape.[3] Tr. at 35-36. Due to his medical conditions, Plaintiff testified that he experiences pain when he

---

[3]    Based upon Plaintiff's testimony and the Court's observation of the physical condition of the manual wheelchair, at the close of the evidence, the Court directed DOCCS to provide plaintiff with a different manual wheelchair that was measured and fitted by a medical specialist or someone qualified to make adjustments to a wheelchair. Tr. at 525.

propels himself in his manual wheelchair. *Id*. at 27-28. Plaintiff cannot rotate his left arm and has use of only two fingers on his left hand. *Id*. at 11. Plaintiff can only propel himself slowly, for ten minutes at a time, in his manual wheelchair. *Id*. at 27, 52. The evidence presented at trial established that on December 3, 2012 and December 7, 2012, Plaintiff complained of back, neck, and rotator cuff pain. Tr. at 450. In February 2013 and August 2013, Plaintiff filed a grievance claiming that the "non-fitted manual wheelchair" caused him pain. Jt. Exhs. 3, 4. From August 2013 until December 2013, Plaintiff complained of back pain, neck pain, rotator cuff pain, and left arm pain due to propelling himself in the manual wheelchair. *Id*. at 450. In 2016, Plaintiff complained of pain due to moving himself in the wheelchair. Jt. Exh. 30(d); Tr. at 51-52. While DOCCS presented evidence that Plaintiff did not seek medical attention from December 8, 2012 through April 8, 2013, Plaintiff explained that he did not seek medical attention because he needed Benadryl to sleep and when he complained about pain, the response was to "take away the Benadryl." Tr. at 24, 28.

At Marcy C.F., mobility assistants were assigned to dormitories with mobility impaired inmates, but not assigned to any particular inmate.[4] Tr. at 336-337. At Franklin C.F., the dormitory officer created a daily schedule for the assistants because "some inmates don't like other inmates." *Id*. at 283. At Groveland C.F., assistants are assigned to a specific inmate and are also "on call." *Id*. at 384, 399. While the IMAP was implemented differently at each facility, the evidence established that mobility assistants were available to help Plaintiff to the bathroom, meals, or other services, upon Plaintiff's request. Tr. at 256, 280-293, 384, 398, 399, 403. With respect to the bathroom, if Plaintiff needs assistance to go to the bathroom during the night,

---

[4]    Kelly testified that assistants were assigned to a particular inmate. Tr. at 324. Kinderman provided contradictory testimony. *Id*. at 337-38. Because Kelly testified that Kinderman was the individual responsible for supervising the IMAP, (*id*. at 302), the Court assigns weight to Kinderman's testimony.

Plaintiff was/is compelled to ask a fellow inmate for help. *Id.* at 265, 287, 295, 403. Alternatively, Plaintiff could attempt to get the attention of the dormitory officer and the officer would wake an inmate to assist Plaintiff. *Id.* Plaintiff testified that if he did not exercise either option, he was forced to propel himself to the bathroom during the night with pain or suffer the humiliation of soiling himself. Tr. at 30; Jt. Exh. 8. On more than one occasion, during the night, Plaintiff accidentally urinated and/or defecated himself because he did not want to wake an inmate to push him to the bathroom. *Id.* Plaintiff did not ask to go to the infirmary after these incidents because he was humiliated.[5] Tr. at 72. Plaintiff testified that he is embarrassed and humiliated that he must to rely upon another inmate to transport him through the facilities. *Id.* at 29, 34.

While mobility assistants are also available to push Plaintiff to meals and yard time, Plaintiff testified that, despite his requests, assistants were not eager to help. At times, Plaintiff had to ask five or six inmates to push him to meals. Tr. at 30-35. When inmates refused to take him to meals, he would arrive late or eat whatever was in his cell. *Id.* While mobility assistants would take Plaintiff to the yard, Plaintiff was not able to move himself around the yard, and was forced to sit close to the bathroom. *Id.* at 30, 32-34. Plaintiff testified that, at Groveland C.F., mobility assistants are not available after 7:00 p.m. *Id.* at 37-38. If Plaintiff wants to go to the law library, gym, library, or yard after 7:00 p.m., he is required to propel himself in his manual wheelchair. Tr. at 37-38. Groveland C.F. has an "open yard" policy, i.e., inmates can freely visit the yard. *Id.* at 38. During the evening, however, inmates must keep moving and cannot sit in the

---

[5] While Adams and Bryan both testified that they were never notified by Plaintiff that he had difficulty propelling himself to the bathroom, both witnesses are/were assigned to the 7:00 a.m. to 3:00 p.m. shifts at their respective facilities. Tr. at 279, 376. Defendants did not present any evidence or testimony contradicting Plaintiff's testimony related to the difficulties he experienced using the bathroom during the evening hours.

yard. *Id.* Therefore, Plaintiff is precluded from going outside in the evening.[6] *Id.* at 38. Plaintiff feels "insecure" without his motorized wheelchair because if a fight or disturbance erupts in his facility, he would be "helpless." Tr. at 73.

Plaintiff conceded that he did not report these difficulties or incidents and never made any complaints to anyone, at any facility, related to a specific mobility assistant or the IMAP. Tr. at 25-26, 340, 396. Plaintiff explained that he could not complain about the mobility assistants because he feared retaliation. *Id.* at 25, 340. Plaintiff felt that it would be dangerous for him to "snitch" due to his condition and further, that it would make it harder for him to get a mobility assistant in the future. *Id.* at 25-26. Despite the fact that there is no documentary support for Plaintiff's claims, the Court finds Plaintiff's testimony to be credible.

The undisputed evidence established that, on a daily basis, Plaintiff relied, and continues to rely, upon the IMAP to provide him access to prison services and programs. Thus, Plaintiff is beholden to the assistants, their whims, and their moods. Indeed, Officer Adams conceded that not all inmates get along with others, and thus, he continually changed his mobility assignments. Therefore, in order to access services and programs, Plaintiff must remain in the assistant's "good graces." If, for some reason, Plaintiff falls "out of favor" with an assistant, he is left with insufferable choices. Plaintiff can opt to report the assistant to the dormitory officer, he can remain silent and be confined to his cell, or he can attempt to propel himself, resulting in documented pain.

In a normal prison setting, it is easy to envision the ramifications an inmate could endure if he reports a fellow inmate to an officer. It is even more unsettling to imagine the consequences

---

[6]     Officer Bryan testified that assistants are "on call pretty much all day long for regular programs or regular visits or regular medicine, whatever is needed by the wheelchair inmate." Tr. at 384. Bryan, however, is the dormitory officer for the day shift and did not specifically refute Plaintiff's testimony that he was compelled to propel himself to services and programs after 7:00 p.m. *Id.* at 376.

facing an inmate who "snitches" on another inmate and then, must rely upon his fellow inmates to provide him with access to programs, yard, meals, bathroom, and other basic services. Indeed, Plaintiff's fear of retaliation was confirmed by Officer Bryan who testified that he has seen assistants pressure or threaten a mobility impaired inmate. Tr. at 395. Officer Bryan described instances where assistants will take belongings, commissary, food, or tobacco products from the wheelchair inmates. *Id*. Bryan further testified that an assistant may also try to extort money from the mobility impaired inmate even though the assistant is already paid for the job. *Id*.

Based upon the evidence presented, the Court finds that, as applied to Plaintiff, the IMAP prevents him "from effectively moving about the facility and discourages him from participating in prison activities." *See Wright*, 831 F.3d at 74 (holding that an IMAP may be ineffective if it requires an inmate "to seek out and rely upon the cooperation of other inmates") (citation omitted). The Court acknowledges that the witnesses provided conflicting testimony with respect to when Plaintiff was required to request aid from an assistant or dormitory officer. Nevertheless, the contradictory testimony is of little relevance. Regardless of whether Plaintiff needed to request an assistant five minutes or an hour in advance, "by requiring inmates to make a formal request in advance for an aide, DOCCS has created a system which fails to provide inmates with mobility assistants in situations where their need to move cannot be contemplated in advance." *Wright*, 831 F.3d at 74 (holding that "[a] mobility-impaired inmate that must book a mobility aide 'well in advance' will be unlikely, for example, to obtain assistance when a sudden need to use the restroom arises and will probably avoid the prison yard, lest he or she be unable to escape a prison fight quickly"). For Plaintiff, the proposed accommodation creates difficulties, causes him humiliation, and renders him completely dependent upon other inmates. Accordingly, the Court concludes that Plaintiff was and is denied meaningful access to benefits and services due to his

disability.  *See Flynn v. Doyle*, 672 F.Supp.2d 858, 879 (E.D. Wisc. 2009) (finding that it was reasonable to infer that the prisoner felt "that she could not go to church unless she embarrassed herself by putting herself and her fellow inmates in the awkward and dangerous position of trying to push and lift her in her wheelchair"); *see also Marcano-Rivera v. Pueblo Int'l, Inc*., 232 F.3d 245, 257 (5th Cir. 2000) (holding that to require an employee to engage in the "laborious" and "humiliating process" of operating a cash register with a "specially designed stool" and move herself from the wheelchair to the stool, in the presence of numerous observers, was an unlawful failure to accommodate in violation of the ADA).

**E.    Undue Burden**

Having determined that the IMAP, as applied to Plaintiff, violates the ADA and RA, the Court must now decide whether allowing Plaintiff to use his motorized wheelchair would unduly burden DOCCS.  In this regard, DOCCS must demonstrate that the proposed accommodation, i.e., providing Plaintiff with access to his motorized wheelchair, would cause DOCCS to suffer an undue hardship.  *See Wright*, 831 F.3d at 76.

Clearly, DOCCS' staff is inundated, on a daily basis, with challenges to safety and security from seemingly innocuous items.  Inmates are capable of fashioning weapons from eyeglasses, utensils, pens, pencils, and the blade of a fan.  Tr. at 153, 188, 205, 264.  Indeed, the witnesses agree that anything introduced into a correctional facility could pose a security risk.  *Id.* at 187. The experts disagree, however, on whether a motorized wheelchair poses safety and security concerns above and beyond those presented with a manual wheelchair.  Based upon the evidence presented at trial, the Court finds that it does not.

A manual wheelchair presents many of the same safety concerns as a motorized wheelchair.  For example, a manual wheelchair could be used to "run into someone," as a

barricade, or to hide contraband.  Tr. at 192-93.  While Waldron testified that the headrest, arm

rest, and leg rest could be removed from the motorized wheelchair and used as weapons, the same

possibility exists with the manual wheelchair.  *Id*. at 148, 187.  As to risks presented by the

"extremely flammable and toxic" urethane foam in the seat cushion, Plaintiff was permitted to

remove the seat cushion from his motorized wheelchair to use with his manual chair in each

facility and is presently in possession of the cushion.  *Id*. at 62, 152, 189.  Moreover, the risk of

secreting contraband is present in either type of wheelchair and both wheelchairs are subject to

searches.  Tr. at 66, 190.

      The evidence also established that many of the safety concerns related to the motorized

wheelchair are already present in the prison setting.  Tr. at 184-186.  Inmates operate forklifts,

lawn mowers, and vans.  *Id*. at 184, 194.  These vehicles and equipment are heavy in weight,

could be used as weapons, and require batteries.  *Id*. at 185.  Additionally, inmates are permitted

to possess, and keep in their cube/cell, electrical equipment with wiring.  *Id*. at 186.  These items

include lamps, electric typewriters, audio equipment, and extension cords (up to nine feet in

length).  Tr at 186.  Plaintiff testified that presently, in his cell at Groveland C.F., he has a lamp, a

fan, and a radio.  *Id*. at 74.

      While the cost of the accommodation is a relevant factor, the "expenses" listed by

Waldron in the Assessment, are not.  Waldron opined that, "[i]f the wheelchair breaks down

DOCCS may be required to pay the cost of technical services, parts or replacement."  Jt. Exh. 16.

During trial, Plaintiff testified that he does not expect DOCCS to incur any financial burden with

respect to the motorized wheelchair and intends to personally pay for maintenance, service, and

technical work.  Tr. at 73-74.

      DOCCS' concerns related to "adverse impacts upon inmate" are equally unfounded.  In the

Assessment, Waldron stated that Plaintiff will be required to dismount the wheelchair each time it is searched. Jt. Exh. 16. Waldron concluded that this will "likely" cause Plaintiff discomfort. *Id*. These concerns are belied by the testimony presented at trial. Presently, Plaintiff and the manual wheelchair are searched when Plaintiff returns from program. Tr. at 68-69. Plaintiff, who is only able to stand for ten seconds, is required to stand and get out of his manual wheelchair each time it is searched. Tr. at 40, 68-69.

Finally, DOCCS did not consider any alternative solutions or means to mitigate the potential security risks. Tr. at 197. Infantino testified that if Plaintiff had sought to use his motorized wheelchair in a specific program area or to do a specific task, "there could be approval." Tr. at 441-442. However, the Assessment did not include any consideration for whether Plaintiff would be able to use his wheelchair in some areas at Groveland C.F. or in any other DOCCS facility. *Id.*

The Court acknowledges that the introduction of Plaintiff's motorized wheelchair will present burdens upon DOCCS related to training and searches. Kelly testified, without support, that "to search the motorized wheelchair on a daily basis would require training 300 to 400 corrections officers." Tr. at 312. The Court does not find this statement credible. The evidence established that at each facility, Plaintiff was assigned to a dormitory. Kelly admitted that there are three shifts for officers in the dormitory. Therefore, Kelly conceded that, "for the most part, [Plaintiff] is seeing the same group of COs in that bunk on a daily basis." Tr. at 312-13. Furthermore, Waldron testified that both the manual and motorized wheelchair would need to be carefully inspected on a frequent basis and estimated that a search of the motorized wheelchair would take "four minutes to five minutes." *Id*. at 191, 206. Accordingly, the introduction of Plaintiff's motorized wheelchair into DOCCS' facilities may burden DOCCS, but not in an undue

fashion.

## IV.  CONCLUSION

Having held a non-jury trial on these issues, the Court concludes that DOCCS failed to conduct the necessary individualized inquiry into the risks of allowing Plaintiff to use his motorized wheelchair.  The Court holds that the preponderance of credible evidence at trial established that Plaintiff was denied meaningful access to benefits and services and the use of his motorized wheelchair in the DOCCS' facilities would not unduly burden DOCCS.  This decision does not purport to conclude that DOCCS must provide a motorized wheelchair to all inmates who request such an accommodation.  It is tailored only to Plaintiff in this case.

After carefully reviewing the entire record in the matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's request for a permanent injunction is **GRANTED**.  Plaintiff will be permitted to use his personal motorized wheelchair while in DOCCS custody; and the Court further

**ORDERS** that Plaintiff shall incur the expense of any routine service or maintenance necessary for the subject wheelchair; and the Court further

**ORDERS** that DOCCS provide Plaintiff with his motorized wheelchair within **FOURTEEN DAYS** of the date of this Order;[7] and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Plaintiff's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

---

[7]       The Court recognizes that DOCCS' employees will require some training with respect to safety and security measures applicable to the motorized wheelchair.  For that reason, the Court has provided this fourteen day time period.

and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 10, 2017
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

26